2012 Ark. App. 73

**Dustin Kyle CHASTAIN, Appellant**

v.

**Courtney Heather CHASTAIN, Appellee.**

**No. CA 10–1175.**

Court of Appeals of Arkansas.

Jan. 18, 2012.

Lea Ellen Fowler, North Little Rock, for appellant.

Traci Harris Lacerra, North Little Rock, for appellee.

CLIFF HOOFMAN, Judge.

Appellant Dustin Kyle Chastain appeals from the trial court's order granting appellee Courtney Heather Chastain's motion to change custody and to relocate with the parties' two minor children. On appeal, appellant argues that (1) the trial court erred by considering evidence outside of the record; (2) the trial court's finding that the parties did not have true joint custody was against the preponder-

ance of the evidence; (3) the trial court's finding that appellee should be allowed to relocate with the children without finding that the move was in the best interest of the children was clearly erroneous. We affirm on all points.[1]

The parties to this appeal were married in 2005 and have two children, A.C. and B.C., who were five years old and three years old at the time of the hearing on appellee's motion to change custody. The parties entered into a marital settlement agreement on May 12, 2009, which was incorporated into their divorce decree entered on June 16, 2009. The parties provided in their agreement that parental responsibility would be shared by both parents and that custody of the children would be "joint and equal with the mother having the primary residence." The agreement set out "Secondary Residential Responsibility, Visitation, or Time," as follows:

On the months in which Dustin Chastain is assigned day shift hours, the children will stay with Courtney Chastain from 5:00 PM Thursday through 5:00 PM Sunday. Dustin Chastain will have the children from 5:00 PM Sunday night through 5:00 PM Tuesday. The parents will alternate custody of the children Wednesday nights.

On the months in which Dustin Chastain is assigned evening shift hours, the children will stay with Courtney Chastain from 5:00 PM Wednesday through 5:00 PM Monday. Dustin Chastain will have the children from 5:00 PM Monday through 5:00 PM Wednesday. Also Dustin Chastain will be allowed unlimit-

ed visitation on nights he chooses and is available for the children.

In addition, the agreement stated that both parties would split all child-related expenses evenly and that neither party was required to pay child support. It also provided that the parent granted primary residential responsibility of the children shall have the benefit of any tax deductions for the children.

On June 7, 2010, appellee, who was employed as an intelligence analyst with the Arkansas Air National Guard, filed a motion for change of custody and requested permission to move with the children to Fort Bragg, North Carolina, to accept new employment as a civilian contractor. She alleged that there had been a material change of circumstances since the award of custody was entered and that there had not been an equal division of time between the parties with respect to custody. During months when appellant worked the night shift, appellee alleged that she had custody more than eighty percent of the time and that she also had primary parental responsibilities for doctors' visits, extracurricular activities, and school arrangements. In addition, appellee alleged that appellant had accepted a position with the United States Marshals Service, that he would be out of state attending training for six months, and that his new work responsibilities would prevent him from caring for the children overnight. Appellee asserted that her new job opportunity in North Carolina would pay twice the salary of her current employment and that her schedule would also be more conducive to parenting the children. She alleged that it was in the best interests of the children that custody be

---

1. This case is again before us after we previously ordered that appellant supplement his addendum to include relevant pleadings and letter briefs contained in the record. *Chastain v. Chastain,* 2011 Ark. App. 495, 2011 WL 3837046. Appellant has filed a supplemental addendum containing these missing documents, and we now address the merits of the appeal.

changed to her and prayed that she be permitted to relocate with the children, with appellant being entitled to liberal visitation.

Appellant filed a response denying appellee's allegations. Prior to the hearing on the motion, appellee married Joseph Dark, a warrant officer, who was stationed at Fort Bragg, North Carolina. At the hearing on September 27, 2010, appellee testified that she met Dark when they were both deployed to Haiti in January 2010 and that she wished to relocate with the children to North Carolina to join Dark and to accept a job offer as a civilian contractor. Appellee stated that this new employment opportunity would double her current salary, that she would have a three- or four-day weekend every week, and that she would no longer be worried about being deployed for disaster relief. She testified that she and Dark had arranged to rent a three-bedroom house with a nice yard and that they had checked into registering her older child at the nearest elementary school, which was less than two miles away. Appellee further testified that there would be daycare and before- and after-school care for both children at a nearby childcare facility. She stated that she and Dark also had friends in North Carolina with children around the same age as her children and that there would be opportunities for her children to be engaged in activities such as soccer, dance, and karate with these other children. Although appellee had no extended family in North Carolina, she testified that she would now be able to afford to visit her family in Washington due to her increased salary. She also testified that she would try to complete her required quarterly National Guard drills in Arkansas, so that appellant and his family could visit with the children during those time periods. Appellee further stated that she would be willing to facilitate liberal visitation with

appellant by allowing him at least eight weeks of visitation in the summer, spring break and Thanksgiving holiday visitation, and a week at Christmas. She testified that she was also willing to pay for half of appellant's airfare if he wanted to visit the children in North Carolina.

Appellee testified that she and appellant intentionally named her as the primary residential parent in their settlement agreement so that the children would be able to attend the Cabot School District, where she resided. Since the parties' divorce, appellee testified that she had been the primary caretaker of her children, except during her deployment to Haiti, and that she usually handled the discipline and took them to their doctors' visits. Appellee stated that she had attempted to give appellant equal time with the children, although she indicated that the children often stayed with appellant's mother or sister when in his custody due to his work schedule.

Appellant testified that he and appellee had agreed upon joint, equal custody of the children at the time of their divorce. He stated that neither party consulted an attorney but that appellee used an online service to draw up their settlement agreement. He agreed that appellee was named as the primary residential parent because they wanted the children to attend school in Cabot, where she lived. Appellant testified that he did not pay child support because he and appellee shared all child-related expenses equally. He stated that he was employed as a state trooper and that he rotated from day shifts to night shifts on a monthly basis. According to appellant, he also sometimes worked for the U.S. Marshals Service when he was off-duty, although he resigned from the SWAT team because it was interfering with his time with his children. Appellant testified that he lived in a three-bedroom

apartment with a male roommate and that the children shared a room when they stay with him. He stated that he had applied to work full-time for the U.S. Marshals Service and that he had been conditionally accepted but had not yet been officially offered a job. He agreed that he would have to attend out-of-state training for five months if he were offered the position.

Regarding appellee's request to relocate to North Carolina, appellant testified that he was opposed to the move because he loved his kids and "it would kill" him to not see them as frequently. He also stated that his children had a very close relationship with his family and that it would be devastating for the children not to be around them. Appellant testified that there had not been a change in circumstances since the divorce and that it was not in the children's best interests to move to North Carolina.

Both parties agreed at the hearing that a primary issue to be decided by the trial court was whether the parties had true, joint-physical custody under the terms of their settlement agreement or whether appellee had primary physical custody and was entitled to a trial court requested that the parties file letter briefs arguing their respective positions and stated that it would make a decision after reviewing the briefs.

After the parties submitted their briefs, the trial court entered its decision on October 7, 2010, finding that appellee was the primary custodian based on the testimony of the parties and the terms of their settlement agreement. In making this determination, the trial court noted that several other states recognize the term "primary residential parent" as synonymous with "custodial parent," although Arkansas does not typically use that term. The court further noted that appellant's visitation schedule was described in a section titled "Secondary Residential Responsibility, Visitation or Time," that appellee testified that she is the primary caregiver, and that the parties' testimony indicated that the term "primary residential parent" was used to ensure that the children would be in the Cabot School District when they reached school age. Finally, the court found that it was relevant that the agreement provided that the primary residential parent was entitled to any tax deductions on behalf of the children, because Administrative Order Number 10 and our case law support the position that the custodial parent is presumptively entitled to these tax deductions. Thus, the trial court found that appellee was entitled to a presumption in favor of relocation and discussed the applicable factors relevant to the petition to relocate. The trial court further found that appellant had failed to rebut this presumption and that appellee was allowed to relocate with the children to North Carolina. The order also set out a visitation schedule for appellant. Appellant now appeals from the trial court's decision and asserts several points on appeal.

In reviewing equity cases, appellate courts conduct a de novo review of the record and do not reverse a finding by the trial court unless it is clearly erroneous or clearly against the preponderance of the evidence. *Valentine v. Valentine,* 2010 Ark. App. 259, 377 S.W.3d 387. We also give due deference to the trial court in judging the credibility of the witnesses, and this deference is even greater in cases involving child custody, as a heavier burden is placed upon the trial court to utilize to the fullest extent its powers of perception in evaluating the witnesses, their testimony, and the best interest of the children. *Id.*

Pursuant to our supreme court's decision in *Hollandsworth v. Knyzewski,* 353 Ark. 470, 109 S.W.3d 653 (2003), a

custodial parent no longer has the burden to prove a real advantage to himself or herself and the children in order to relocate. Instead, the primary custodian is entitled to a presumption in favor of relocation, and the noncustodial parent has the burden to rebut this presumption and show that the move would be detrimental to the children's best interests, using the factors set out in *Hollandsworth*. *Id.* Therefore, the meaning of the language in the parties' settlement agreement stating that they would share "joint and equal" custody but that appellee would be the "primary residential parent" was an important issue to be determined by the trial court.

Because the trial court found the provision in the agreement allowing appellee, as the primary residential parent, to have the benefit of any tax deductions for the children was persuasive evidence that the parties intended for appellee to be the custodial parent, appellant argues on appeal that the court committed reversible error by considering evidence outside the record before it, because there was no evidence presented by either party as to who had actually claimed these tax deductions. This argument need not be addressed, however, as it was not raised to the trial court. It is well settled that in order to preserve an argument for appeal, the issue must first be raised at the trial court level. *Doss v. Miller*, 2010 Ark. App. 95, 377 S.W.3d 348.

In any event, as appellee asserts in her brief, no error occurred here because the trial court did not consider evidence outside the record in making its decision. The trial court found that the provision in the parties' agreement awarding the primary residential parent the benefit of tax deductions was relevant, but the court made no findings regarding which party had actually taken the deductions, as there

was in fact no evidence presented on this matter. As the trial court did note, however, under Administrative Order No. 10, the primary custodial parent is presumptively entitled to a tax deduction; thus, the trial court acted appropriately in taking into consideration a similar provision in the parties' agreement in this case, where the issue was whether the parties had intended a joint physical-custody arrangement or one where appellee was to be the primary custodian. Whether appellee had actually claimed the deduction is simply not relevant to this issue and was not considered by the trial court. Thus, there is no merit to appellant's argument on this point.

In a related argument, appellant contends that the trial court's finding that the parties did not have true, joint-physical custody of the children under the terms of their settlement agreement was clearly against the preponderance of the evidence. This court's standard of review for contract interpretation is set out in *Poff v. Peedin*, 2010 Ark. App. 365, at 3–4, 374 S.W.3d 879, 881:

> When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed. As explained by our supreme court in *Wal–Mart Stores, Inc. v. Coughlin*, 369 Ark. 365, 371, 255 S.W.3d 424, 429 (2007):
>
> Our standard of review for contract interpretation has been stated often:
>
> > The first rule of interpretation of a contract is to give to the language employed the meaning that the parties intended. In construing any contract, we must consider the sense and meaning of the words used by the parties as they are taken and under-

stood in their plain and ordinary meaning. The best construction is that which is made by viewing the subject of the contract, as the mass of mankind would view it, as it may be safely assumed that such was the aspect in which the parties themselves viewed it. It is also a well-settled rule in construing a contract that the intention of the parties is to be gathered, not from particular words and phrases, but from the whole context of the agreement.

The court is to give great weight to the construction of the contract given to it by the parties, and it may look to the conduct of the parties to determine their intent. When a contract is free of ambiguity, its construction and legal effect are questions of law for the court to determine. Language is ambiguous if there is doubt or uncertainty as to its meaning and it is fairly susceptible to more than one equally reasonable interpretation. The determination of whether ambiguity exists is ordinarily a question of law for courts to resolve.

(Citations omitted.)

In interpreting the parties' agreement in this case in order to determine their intended custodial arrangement, the trial court relied on language contained in several different sections of the agreement, as well as the parties' testimony at the hearing regarding their intent. The court found that the parties did state that "custody will be joint and equal"; however, they also stated that appellee would be the "primary residential parent" and that appellant would be awarded very liberal "visitation" under the section titled "secondary residential responsibility." The trial court noted that the agreement was completed by the parties without the assistance of counsel and that the term "primary residential parent" is not one commonly used in this state. However, in other states such as Delaware, Florida, Louisiana, and Oregon, this term is synonymous with "custodial parent," the term typically used in Arkansas to describe which party has primary care of the minor children. As mentioned $\lfloor_{10}$earlier, the trial court further found to be persuasive the section in the parties' agreement awarding appellee, as the primary residential parent, the benefit of any tax deductions for the children, a benefit presumptively awarded to the primary custodial parent in Arkansas under Administrative Order No. 10. In addition, the court relied on the testimony of appellee that she is the primary caregiver for the children, enrolling them in school, taking them on field trips and play dates, and taking them to the doctor even when the children were in appellant's custody. Both parties also testified that appellee was intentionally named as the primary residential parent so that the children could attend Cabot schools when they reached school age. The trial court concluded that, by reading the settlement agreement in context, the parties intended for appellee to be the primary custodian, with appellant enjoying "extremely liberal visitation of up to one-half of the time with the children." The trial court further noted that joint custody was disfavored in Arkansas and that this court has previously held that generous visitation does not constitute joint physical custody. *Shannon v. McJunkins*, 2010 Ark. App. 440, 376 S.W.3d 489. The trial court's interpretation of the parties' agreement is not clearly against the preponderance of the evidence, and we affirm on this point.

■ In his third point on appeal, appellant argues that, because the trial court failed to expressly find that the relocation was in the children's best interests, its decision allowing appellee to move with the children was clearly erroneous. Appellant

asserts that the trial court only found that he failed to rebut the presumption in favor of allowing appellee to relocate and that this is not sufficient, as the "polestar" consideration remains the best interests of the children.

Under the law governing relocation cases, as set out in *Hollandsworth, supra,* the presumption in favor of the custodial parent's relocation must be rebutted by the noncustodial parent, who has the burden to show that the move will have a detrimental effect on the child and on visitation with the noncustodial parent. The trial court must then decide whether the noncustodial parent has sufficiently rebutted the presumption and whether the move is in the children's best interests by using the factors set out in *Hollandsworth:* (1) the reason for the relocation; (2) the educational, health, and leisure opportunities available in the location in which the custodial parent and children will relocate; (3) the visitation and communication schedule for the noncustodial parent; (4) the effect of the move on the extended family relationships in the location in which the custodial parent and children will relocate, as well as Arkansas; and (5) the preference of the child, including the age, maturity, and the reasons given by the child as to his or her preference. *Id.* at 485, 109 S.W.3d at 663–64.

While the trial court in this case did not specifically state that the relocation was in the children's best interests, the court did find that appellant failed to rebut the presumption in favor of the move and discussed the applicable *Hollandsworth* factors relevant to the children's best interests. The court noted that appellee's reasons for her desired relocation were to be with her new husband and to pursue a better job opportunity, where she will double her current salary; to provide more financial stability for her and the children; and to offer the children a two-parent household. The trial court also noted the evidence that the children will be able to attend a neighborhood school and participate in extracurricular activities with other children their age. Further, the court found that appellee would cooperate with visitation with appellant and that, even though the move would have a detrimental impact on the amount of appellant's visitation and the relationship with the children's extended family in Arkansas, this did not outweigh the benefits in favor of relocation. Because of the children's young age, there was no evidence presented as to their preference on the move. Based on its evaluation of the *Hollandsworth* factors, the trial court found that appellee should be allowed to relocate with the children.

Thus, even though the trial court did not specifically state that the move was in the children's best interests, it did consider the appropriate factors relevant to this determination. As appellee points out, appellant did not request that the trial court set forth specific findings of fact and conclusions of law, as he was entitled to do under Ark. R. Civ. P. 52. Further, when the trial court fails to make certain findings of fact, the appellate court, under its de novo review, may nonetheless conclude that the evidence supported the decision. *Hamilton v. Barrett,* 337 Ark. 460, 989 S.W.2d 520 (1999). Because the evidence clearly supported the trial court's decision to allow appellee to relocate in this case, there is no merit to appellant's argument on this point, and we affirm.

Affirmed.

VAUGHT, C.J., and ABRAMSON, J., agree.